# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**RALPH TOMEONI,**  Case No. 1:18 CV 598

 Plaintiff,

v.  Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

 Defendant.  MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Ralph Tomeoni ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 12). For the reasons below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB on January 14, 2015, alleging a disability onset date of September 7, 2014. (Tr. 250-51). His claims were denied initially and upon reconsideration. (Tr. 188-91, 204-06). Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ") on December 15, 2015. (Tr. 211-12). Plaintiff (represented by counsel), and a vocational expert ("VE"), testified in front of the ALJ on March 14, 2017. (Tr. 132-54). On June 16, 2017, the ALJ found Plaintiff not disabled in a written decision. (Tr. 107-23). The Appeals Council denied Plaintiff's request for

review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-4); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on March 14, 2018. (Doc. 1).

**FACTUAL BACKGROUND**

Personal Background and Testimony

Plaintiff was born in April 1967, making him 47 years old on the alleged onset date. *See* Tr. 250. Plaintiff had past work in retail management where he was responsible for daily store operations, inventory control, employee training, and general customer service. (Tr. 135). He could no longer work because he "blacked out" while working and had numbness in his arms. (Tr. 136). Plaintiff had neck pain, which triggered migraines; the migraines in turn triggered the blackouts. *Id*. Plaintiff took medication to prevent the neck pain which would "somewhat" prevent the migraines and blackouts. (Tr. 136-37).

Plaintiff was involved in a car accident in 2012 that resulted in left arm numbness, tingling in his fingers, and severe pain on the left side of his neck. (Tr. 139). He returned to work following the accident, but often called in sick due to these symptoms. *Id*. Plaintiff's migraines increased following the accident, to "[a]t least three times a month", each lasting eight to ten hours. (Tr. 144). He had neck surgery in August 2012, which did not significantly improve his symptoms. (Tr. 140). Following the surgery, Plaintiff tried spinal injections, physical therapy, aquatic therapy, chiropractic treatment, therapeutic massages, and stem cell treatments. *Id*. These offered only "temporary" relief. *Id*.

In February 2014, Plaintiff was injured at work when a box fell on him and "aggravated discs three and four"; doctors did not recommend surgery for this back injury. (Tr. 139).

Plaintiff had numbness in both extremities, including both shoulders where he also experienced "constant pain". (Tr. 141). The pain affected Plaintiff's ability to carry things and

reach for objects above his head. *Id*. Plaintiff also experienced cramping in his hands along with "constant[]" numbness and tingling. (Tr. 141-42).

Plaintiff also testified to numbness and tingling in his lower back, as well as pain and pressure from one of the discs in his back. (Tr. 142). This general back pain was aggravated by walking, sitting, or standing. *Id*. He was unable to lift more than five pounds. (Tr. 142-43). He used a TENS unit in combination with lying down to treat this pain; he previously took pain medication but doctors discontinued it because it did not help. (Tr. 143-44).

Plaintiff lived alone; he cooked and cleaned for himself but had a hard time doing so. (Tr. 146-47). He completed simple cleaning tasks like vacuuming, lifting laundry, and lifting laundry detergent, but doing so caused him pain, such that he had to spread the tasks out over a period of time. (Tr. 147).

He left the house less frequently than before on account of his depression, but went to the chiropractor, the grocery store, and the post office. (Tr. 147-48). He went to the grocery store two to three times a week because he could not carry much at once. (Tr. 148). While at home, he spent the majority of his time reading news online, but pain prevented him from doing so for an extended period of time. *Id*. Plaintiff also did not sleep well on account of pain and muscle spasms. (Tr. 148-49).

Relevant Medical Records

In early 2012, Plaintiff injured his neck in a car accident and underwent a neck operation shortly thereafter. *See* Tr. 345, 341. He also participated in physical therapy and took pain medication for the injury. *Id*. Plaintiff underwent a cervical spine operation in August 2012. *See* Tr. 317.

3

In July 2014, Plaintiff treated with Stacy Schmotzer, M.D., for neck pain with stiffness which radiated down to his left arm. (Tr. 565). Plaintiff reported the severe neck pain triggered migraine headaches. *Id*. On examination, Plaintiff had discomfort with palpation along his lower cervical spine and increased pain in his right arm and shoulder with abduction. *Id*. Dr. Schmotzer prescribed pain medications and recommended Plaintiff follow up with his spine surgeon and pain management specialist. *Id*. In August, Plaintiff returned to Dr. Schmotzer for low back pain. (Tr. 315). She found Plaintiff had tenderness throughout his lumbar spine, intact sensation and full strength in both legs, and negative straight-leg raises bilaterally. *Id*.

Plaintiff treated with chiropractor Steven Papandreas, D.C., from August 2014 to March 2015 for neck pain. (Tr. 397-500). At his initial visit, Plaintiff reported "severe" neck pain, headaches, dizziness, bilateral weakness in his upper extremities after being struck in the head at work with a 350-pound metal gazebo. (Tr. 496). At the time of his last appointment with Dr. Papandreas and throughout his treatment, Plaintiff's prognosis remained "guarded and uncertain". (Tr. 399, 442, 446, 450). Dr. Papandreas regularly noted that Plaintiff "reported feeling better after the treatment," (Tr. 407, 411, 415, 419, 423, 442, 446, 450), and that his condition was "well controlled at this time" and improving (Tr. 442, 446, 450, 454, 458, 462).

In December 2014 and January 2015, Plaintiff saw neurologist James Anderson, M.D., for neck pain and bilateral arm pain/numbness. (Tr. 511-15). Plaintiff reported intense neck pain was aggravated by "sitting, walking, standing, lifting, weather, and range of motion" and alleviated by rest and lying down. (Tr. 515). Dr. Anderson observed a herniated disc at L3-4, spontaneous fusion across the C4-5 level, and the beginning of a bone spur; he referred Plaintiff to a pain specialist for further treatment. (Tr. 511).

Plaintiff underwent mental health treatment with psychologist Jill Mushkat Conomy. Ph.D., from February 2014 through August 2015 (Tr 522-32, 542), and from June 2016 through February 2017 (Tr. 768-76). Dr. Mushkat Conomy noted that he would need ongoing pain and depression treatment throughout the remainder of his life based on the severity of his condition. (Tr. 531). She also found that the depression associated with his pain was "at a level that does not allow him to function in the work force at this point in time." (Tr. 504).

In April 2015, Plaintiff underwent a consultative psychological examination with Richard Davis, Ph.D. (Tr. 534-38). Plaintiff reported that he watched television at home, grocery shopped, cooked for himself, did laundry, drove, and rode the bus unaccompanied. (Tr. 535-36). Plaintiff was interested in fishing and still able to go, but was unable to golf. (Tr. 538).

In July 2015, Plaintiff reported to Dr. Schmotzer that he had "snapped" both of his knees—hurting his right knee getting out of bed and could not remember how he hurt his left knee. (Tr. 551). He took Tylenol and anti-inflammatories to deal with the discomfort, but they had proved ineffective. *Id*. Two months later during a follow-up, Plaintiff reported starting physical therapy, which helped with the pain in his left knee, but the pain in his right had somewhat worsened. (Tr. 548). Dr. Schmotzer ordered continuing physical therapy, an x-ray of the right knee, and injections. *Id*.

Dr. Schmotzer referred Plaintiff to orthopedic surgeon Michael Hritz, M.D., who treated Plaintiff in September 2015. (Tr. 687). Plaintiff reported much the same symptoms and issues as to Dr. Schmotzer, but added that he had difficulty sitting in chairs, getting out of chairs, and squatting. *Id*. Dr. Hritz recommended a brace for his right knee, a stretching and strengthening program, and if symptoms continued, an MRI. (Tr. 689). Plaintiff had follow-up appointments with both Dr. Hritz and Dr. Schmotzer and continued physical therapy through December 2015.

(Tr. 645-90). He reported decreased pain throughout the treatment (Tr. 649, 656, 659, 674), and no left knee pain (Tr. 662). Plaintiff reported playing basketball during treatment, which may have aggravated his pain. (Tr. 656). Dr. Hritz opined that Plaintiff "slowly [] will get back to full activities" on October 27, 2015. (Tr. 663). Plaintiff was eventually discharged from physical therapy "due to noncompliance". (Tr. 646).

Plaintiff treated with Hong Shen, M.D., in October 2015 for pain in his neck and upper back. (Tr. 701). Dr. Shen noted that Plaintiff had pain radiating across his shoulder blades and down his left arm that triggered headaches. *Id*. The pain also prevented Plaintiff from sleeping well, as he reported only sleeping four hours a night. *Id*. Dr. Shen recommended a spinal cord stimulator, but Plaintiff was "not interested". *Id*.

In April 2016, Plaintiff saw Jason Genin, D.O., for knee pain. (Tr. 711). Dr. Genin reported that Plaintiff engaged in therapy which initially helped, but that "he hasn't kept up with [it] on his own and now the pain is back." *Id*. A bilateral knee x-ray taken later that month revealed no joint effusion; no acute fractures or dislocations; maintained joint spaces in both knees; and a "tiny marginal osteophyte" in both knees. (Tr. 710). A July 2016 MRI of the left knee revealed no significant abnormalities. (Tr. 717-18). In August, Plaintiff had lost twenty pounds but the knee pain persisted. (Tr. 721, 735). Dr. Genin administered an injection into Plaintiff's left knee at that time. (Tr. 735-36).

Plaintiff treated with Emad Daoud, M.D., in August 2016 for neck pain. (Tr. 726). Plaintiff reported no relief from earlier attempts at pain management for his neck, that he was unable to attend a chronic pain rehabilitation program, and that the pain in his neck sometimes triggered migraines. (Tr. 726-27). Dr. Daoud recommended aquatic therapy and a TENS unit. (Tr. 728). Dr. Daoud also recommended Plaintiff attend a chronic pain rehabilitation program, but Plaintiff

declined. *Id*. At his September 2016 aquatic appointment, Plaintiff reported feeling less pressure on his neck after the session and was pleased with his progress. (Tr. 745).

Plaintiff attended a pain management evaluation with Xavier Jimenez, M.D., for neck and back pain in October 2016. (Tr. 750). Plaintiff reported neck and back pain at 7/10. *Id*. On examination, Dr. Jimenez found Plaintiff had "mild discomfort" and limited range of motion in all directions with neck and lower spine movement. (Tr. 753). Dr. Jimenez recommended a chronic pain rehabilitation program. (Tr. 754).

In December 2016, Dr. Daoud noted Plaintiff's pain was worsening – so severe that he was "blacking out", but he was not interested in the chronic pain rehabilitation program or injections. (Tr. 758). Plaintiff reported pain in his neck which radiated into both arms, as well as tingling and numbness in the arms, especially on the left side. *Id*. Dr. Daoud instructed Plaintiff to follow-up as needed. (Tr. 759).

Later that month, Plaintiff reported to Dr. Genin that he had no new injuries, complaints, or complications, and that his left knee was feeling "much better" and that his right knee bothered him "from time to time" but was much better than previously. (Tr. 763). Dr. Genin planned to monitor Plaintiff's symptoms going forward and consider another knee injection if symptoms worsened. *Id*.

Opinion Evidence

In May 2015, State agency physician Abraham Mikalov, M.D., opined Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for approximately six hours in an eight-hour workday; and sit about six hours in an eight-hour workday. (Tr. 165). Plaintiff was unlimited in his ability to climb ramps/stairs; could never climb ladders, ropes, or scaffolds; frequently balance; and occasionally stoop, kneel, crouch, and

7

crawl. (Tr. 165-66). Dr. Mikalov opined these postural limitations were due to Plaintiff's chronic back pain, neck pain, and dizziness. (Tr. 166). Dr. Mikalov further opined Plaintiff was limited in his ability to reach in any direction (including overhead) on the left or right side due to bilateral shoulder pain. *Id*. He was unlimited in his ability to handle, finger, or feel. *Id*. In October 2015, State agency physician Michael Delphia, M.D., concurred with these findings. (Tr. 179-81).

VE Testimony

A VE appeared and testified at the hearing before the ALJ. *See* Tr. 150-53. The ALJ asked the VE to consider a person with Plaintiff's age, education, and vocational background who was physically and mentally limited in the way in which the ALJ determined Plaintiff to be. *See* Tr. 150-51. The VE opined such an individual could not perform Plaintiff's past work as a retail store manager, but could perform his past work as an assistant store manager. (Tr. 151).

ALJ Decision

In a written decision dated June 16, 2017, the ALJ found Plaintiff met the insured status requirements for DIB through December 31, 2018 and had not engaged in substantial gainful activity since his alleged onset date (September 7, 2014). (Tr. 109). She concluded Plaintiff had severe impairments of: degenerative disc disease, asthma, obesity, degenerative joint disease of the knees, diabetes mellitus, and gastroesophageal reflux disease. (Tr. 109, 111). The ALJ then found Plaintiff had the residual functional capacity ("RFC"):

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), with the ability to operate bilateral arm controls occasionally and the ability to perform tasks not requiring overhead reaching bilaterally. The claimant can climb ladders, ropes, or scaffolds never. He can balance frequently, and stoop, kneel, crouch, and crawl occasionally. The claimant would have to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. He must avoid all exposure to hazards such as industrial machinery and unprotected heights.

(Tr. 113). The ALJ found Plaintiff capable of performing his past relevant work as an assistant store manager. (Tr. 122). Thus, the ALJ found Plaintiff not disabled from the alleged onset date, September 7, 2014, through the date of the decision. *Id.*

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The

Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id*. The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id*. Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404-1520(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff raises a single objection to the ALJ's decision – that the ALJ's finding of "light work" is unsupported because she did not properly evaluate the credibility of his pain complaints. (Doc. 13, at 9-17). For the reasons discussed below, the undersigned finds the ALJ's decision supported by substantial evidence and affirms the decision of the Commissioner.

When a claimant alleges impairment-related symptoms, the Commissioner follows a two-step process to evaluate those symptoms. 20 C.F.R. § 404.1529(a); SSR 16-3p, 2017 WL 5180304, *2-8.[1] First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms, *e.g.*, pain. SSR 16-3p, 2017 WL 5180304, *3-4. Second, the ALJ must evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which those symptoms limit the claimant's ability to perform work-related activities. *Id.* at *3, 5-8. To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence. *Id.* at *5-8. In addition to this evidence, the ALJ must consider the factors set forth in 20 C.F.R. § 404.1529(c). *Id.* at *7-8. Those factors include daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, *e.g.*, lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and

---

1. SSR 16-3p replaces SSR 96-7p and applies to ALJ decisions on or after March 28, 2016. *See* 2017 WL 5180304, at *1, 13. The ALJ's decision here is dated June 16, 2017 and thus SSR 16-3p applies. SSR 16-3p clarifies the language of the pre-existing standard in SSR 96-7p, 1996 WL 374186 (1996) to the extent that it "eliminated the use of the term 'credibility' in the sub-regulatory policy and stressed that when evaluating a claimant's symptoms the adjudicator will not 'assess an individual's overall character or truthfulness' but instead 'focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities....'" *Huigens v. Soc. Sec. Admin.*, 718 F. App'x 841, 848 (11th Cir. 2017) (quoting *Hargress v. Soc. Sec. Admin.*, 874 F.3d 1284, 1289-90 (11th Cir. 2017) (quoting in part SSR 16-3p)). Both rulings refer to the two-step process in 20 C.F.R. § 404.1529(c).

restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c). Although the ALJ must "consider" the listed factors, there is no requirement that he discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009).

The Sixth Circuit has explained, interpreting SSR 96-7p, the precursor ruling, that "an administrative law judge's credibility findings are virtually unchallengeable". *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (internal citation omitted). Nevertheless, the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10.

Here, the ALJ correctly identified the two-step process (Tr. 113-14), summarized Plaintiff's medical records (Tr. 114-20), and offered her assessment of his subjective physical symptoms:

> In addition to the objective medical evidence, the undersigned has also considered other factors in evaluating the claimant's statements concerning the intensity, persistence, duration and limiting effects of his severe medically determinable impairments, including the claimant's daily activities and the claimant's history of treatment. However, these factors do not show that the claimant is more limited than determined when setting forth the above residual functional capacity.
>
> The claimant's intact, extensive activities of daily living detract from his allegations of totally debilitating impairment and instead support the foregoing residual functional capacity. The claimant has reported decreased social interaction and outings, and he indicated he does not participate in clubs, do yard work, or golf anymore (Exhibit 6F, Hearing Testimony). However, the claimant lives alone and is able to do his own cooking, laundry, dishes, personal care, grocery shopping, and cleaning (Exhibit 6F). The claimant is able to attend medical appointments and therapy, drive, use public transportation, read for short periods, use the internet, and watch television (Exhibit 6F, Hearing Testimony). These activities confirm the claimant is not as limited, either physically or mentally, as he has alleged.

> In assessing the claimant's allegations, the undersigned has considered the scope of treatment. To the claimant's credit, the record indicates rather extensive medical treatment, including physical therapy, injections, aqua therapy, chiropractic treatment, use of various medications and a TENS unit, neck surgery, and treatment with various providers, including primary care providers, orthopedic specialists, neurologists, and pain management specialists, all without sustained pain relief (Exhibit 1F, 2F, 4F, 5F, 7F, 8F, 9F, l0F, 11F, 12F, 13F). However, recent medical records indicate improved knee pain with injection therapy and some improvement with aqua therapy, and the claimant has declined recent cervical epidural injections, a spinal cord stimulator, or participation in a chronic pain rehabilitation program (Exhibit 12F). *** Furthermore, despite the claimant's ongoing symptoms, he has not required emergency hospitalization or inpatient treatment for pain, headaches, or breathing difficulties (Exhibit 1F, 2F, 4F, 5F, 7F, 8F, 9F, l0F, 11F, 12F, 13F). This evidence suggests that the claimant's physical impairments, while severe, are manageable with the current scope of medical treatment.
>
> The claimant has alleged numerous complaints in support of his application for disability, and the record does support some limitations due to his symptoms and allegations. However, when considering the claimant's testimony in light of the mainly moderate examination findings and intact activities of daily living, the claimant's impairments are not as debilitating as he has alleged. The allegations of disability made by the claimant are therefore not entirely consistent with the evidence.

(Tr. 120).

To say the ALJ's credibility analysis here is extensive is an understatement. The ALJ devoted nearly an entire page of her opinion to this assessment and the undersigned finds it is supported by substantial evidence. The ALJ cited several reasons for discounting Plaintiff's subjective symptom statements – consistent with the factors an ALJ is required to consider under the regulations. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *7. The undersigned finds these reasons are "clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10.

First, the ALJ cited Plaintiff's activities of daily living – by his own testimony – which she alleges: "confirm[s] the claimant is not as limited, either physically or mentally, as he has alleged."

13

(Tr. 120) (citing Tr. 146-47 (Plaintiff lived alone; cooked and cleaned for himself); Tr. 147 (Plaintiff was able to complete simple cleaning tasks like vacuuming, lifting laundry, and lifting laundry detergent); Tr. 147-48 (Plaintiff traveled to the chiropractor, grocery store, and post office; Tr. 148 (Plaintiff went to the grocery store two to three times a week)). The ALJ cited this testimony and concluded his activities of daily living were inconsistent with his allegation of a totally debilitating impairment. (Tr. 120). A claimant's "daily activities" are just one factor the ALJ must consider under the regulations when considering symptoms; she properly did so here. 20 C.F.R. § 404.1529(c); *Lavigne v. Sec'y of Health and Human Servs.*, 1990 WL 9961, at *6 (6th Cir.) ("The performance of daily activities may be used to undermine a claimant's allegations of severe and disabling pain.").

The ALJ further considered the treatments Plaintiff received and the efficacy of such, including: "rather extensive medical treatment, including physical therapy, injections, aqua therapy, chiropractic treatment, use of various medications and a TENS unit, neck surgery, and treatment with various providers, including primary care providers, orthopedic specialists, neurologists, and pain management specialists[.]" (Tr. 120); 20 C.F.R. § 404.1529(c)(3)(iv). She explained: "recent medical records indicate improved knee pain with injection therapy and some improvement with aqua therapy, and the claimant has declined recent cervical epidural injections, a spinal cord stimulator, or participation in a chronic pain rehabilitation program." (Tr. 120). The undersigned finds this determination supported by substantial evidence. For example – contained within treatment records cited by the ALJ – Plaintiff reported to Dr. Genin that he had no new injuries, complaints, or complications, and that his left knee was feeling "much better" and that his right knee bothered him "from time to time" but was much better than it had been. (Tr. 763). Dr. Papandreas regularly noted that Plaintiff "reported

14

feeling better after [chiropractic] treatment" (Tr. 407, 411, 415, 419, 423, 442, 446, 450), and that his condition was "well controlled at this time" and improving (Tr. 442, 446, 450, 454, 458, 462). Further, Plaintiff reported decreased pain throughout physical therapy (Tr. 649, 656, 659, 674), and no left knee pain (Tr. 662). The ALJ's statement that Plaintiff declined several treatment opinions is also supported. *See* Tr. 701 (Plaintiff "not interested" in a spinal cord stimulator); Tr. 646 (Plaintiff discharged from physical therapy "due to noncompliance"); Tr. 728 (Plaintiff "isn't interested in [an] evaluation" at a pain rehabilitation center). It is entirely proper for an ALJ to consider that a claimant declined recommended medical treatment when assessing credibility. *See Blacha v. Sec'y of Health and Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990); *see also Strong v. Soc. Sec. Admin.,* 88 F. App'x 841, 846 (6th Cir. 2004) ("In the ordinary course, when a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that a claimant will seek examination or treatment. A failure to do so may cast doubt on a claimant's assertions of disabling pain."). For these reasons, the undersigned finds the ALJ's consideration of this regulatory factor also supported. 20 C.F.R. § 404.1529(c)(3)(iv).

Contrary to Plaintiff's assertion, the ALJ was not required to discuss every regulatory factor in detail. *White*, 572 F.3d at 287 (an ALJ must "consider" the listed factors, but there is no requirement that she discuss every factor). Further, and importantly here, the ALJ did not rely on one single piece of evidence when she found Plaintiff's statements regarding the severity of his symptoms not fully credible. Rather, she cited multiple points in the record, touching on more than

one of the regulatory factors. Taken together, the reasons stated above provide substantial evidence to support her decision.

## Conclusion

Following review of the arguments presented, the record, and the applicable law, the undersigned finds no error in the ALJ's subjective symptom assessment. The Commissioner's decision denying DIB is supported by substantial evidence and the undersigned therefore affirms that decision.

s/ James R. Knepp II<br>
United States Magistrate Judge